IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Buckeye Forest Council *et al.* | : | |
| | : | Case No. C-1-04-259 |
| Plaintiffs | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| United States Forest Service *et al.* | : | PLAINTIFFS' MOTION FOR |
| | : | SUMMARY JUDGMENT AND |
| Defendants | : | GRANTING DEFENDANTS' |
| | : | MOTION FOR SUMMARY |
| | : | JUDGMENT |

This matter comes before the Court on cross motions for summary judgment of Plaintiffs
Buckeye Forest Council ("Buckeye") and Heartwood (doc. #29) and of Defendants United States
Forest Service ("Forest Service"), United States Fish & Wildlife Service ("Fish & Wildlife"),
and employees and agents of the Forest Service in their official capacities (doc. #32). Before the
Court is also Defendants' Notice of Correction (doc. #37), which Plaintiffs oppose (doc. #38),
and Plaintiffs' Motion to Strike (doc. #31). For the reasons set forth below, Plaintiffs' motion
for summary judgment is **DENIED,** and Defendants' cross motion for summary judgment is
**GRANTED**. Plaintiffs' opposition to Defendants' Notice of Correction (doc. #38) and Motion
to Strike (doc. #31) are **DENIED AS MOOT**.

I.      FACTUAL BACKGROUND

The factual background of this case was set forth extensively in this Court's previous
order granting preliminary injunctive relief to Plaintiffs Buckeye and Heartwood. See Buckeye

1

Forest Council v. United States Forest Service, 337 F. Supp. 2d 1030 (S.D. Ohio 2004).  The following factual background is therefore taken from that order:

Plaintiffs Buckeye Forest Council ("Buckeye") and Heartwood ask for injunctive relief to prevent the Forest Service from proceeding with two timber sale projects in the Wayne National Forest and the implementation of an amendment to the Wayne National Forest's Land and Resource Management Plan ("Forest Plan").  The two projects are the "Bluegrass Project," which consists of two timber sales, and the "Ironton Project."  The Wayne National Forest consists of approximately 230,000 acres of land in southeastern Ohio.  (AR Bk. VII at 1179). The Bluegrass Project involves timber thinning, prescribed burning, and single tree cutting on approximately 300 acres, about one tenth of one percent of the acreage in the Forest.  (AR Bk. II at 469.)  The Ironton Project involves removing downed trees and debris on 930 acres.  (AR Bk. III at 4.)  Buckeye and Heartwood allege that Defendants have violated the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"), the National Environmental Policy Act, 42 U.S.C. § 4332 et seq. ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. § 702 et seq. ("APA"), by authorizing the two projects and the Forest Plan amendment, which Buckeye and Heartwood allege will harm the federally endangered Indiana bat.

The NFMA of 1976 requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).  The Forest Service, which manages the System, develops land and resource management plans pursuant to NFMA and uses these forest plans to "guide all natural

resource management activities." 36 C.F.R § 219.1(b).[1]  Management activities of the Wayne

National Forest are governed by the Forest Plan.

The NEPA establishes a "national policy [to] encourage productive and enjoyable

harmony between man and his environment," and was intended to reduce or eliminate

environmental damage and to promote "the understanding of the ecological systems and natural

resources important to" the United States.  42 U.S.C. § 4321.  "NEPA itself does not mandate

particular results" in order to accomplish these ends.  Robertson v. Methow Valley Citizens

Council, 490 U.S. 332, 350 (1989).  Rather, NEPA imposes only procedural requirements on

federal agencies with a particular focus on requiring agencies to undertake analyses of the

environmental impact of their proposals and actions.  See id., at 349-350.

At the heart of NEPA is a requirement that federal agencies "include in every

recommendation or report on proposals for legislation and other major Federal actions

significantly affecting the quality of the human environment, a detailed statement by the

responsible official on – (i) the environmental impact of the proposed action, (ii) any adverse

environmental effects which cannot be avoided should the proposal be implemented, (iii)

alternatives to the proposed action, (iv) the relationship between local short-term uses of man's

environment and the maintenance and enhancement of long-term productivity, and (v) any

irreversible and irretrievable commitments of resources which would be involved in the

---

[1]The planning rule at issue in this case was promulgated in 1982 and codified at 36 C.F.R. part 219.  In Defendants' Notice of Correction, the Forest Service brings to the Court's attention that the 1982 regulations were repealed and new regulations went into effect on January 5, 2005.  (Doc. #37 at 2.)  The Forest Service also notes that because the 1988 Forest Plan contains a viability requirement nearly identical to that of the 1982 regulations, by which Defendants must abide, there is no practical effect to the repeal of the 1982 regulations and the promulgation of the 2005 regulations in this case.

proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).  This detailed statement is

called an Environmental Impact Statement ("EIS").  An EIS was prepared in conjunction with

the Forest Plan in order to evaluate the Forest Plan's effects on the human environment.

During 1994, the Forest Service reviewed the possibility of implementing the Bluegrass

Project, the goal of which was to move the Wayne National Forest closer to its historical

condition, restoring native ecosystems vanishing from Southern Ohio.  (AR Bk. I at 205.)

Federal regulations allow an agency to prepare an Environmental Assessment ("EA"), a more

limited document than an EIS, if the agency's proposed action does not qualify for a categorical

exclusion or does not clearly require the production of an EIS.  See §§ 1501.4(a)-(b).  The EA is

to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for

determining whether to prepare an [EIS]."  40 C.F.R § 1508.9(a).  If, pursuant to the EA, an

agency determines that an EIS is not required under applicable federal regulations, it must issue

a "finding of no significant impact" ("FONSI"), which briefly presents the reasons why the

proposed agency action will not have a significant impact on the human environment.  See 40

C.F.R. §§ 1501.4(e), 1508.13.  See generally Dept. of Transp. v. Public Citizen, 124 S. Ct. 2204,

2209-10 (2004).  The Forest Service performed an EA for the Bluegrass Project in order to

examine the potential environmental consequences of the Project.  Buckeye, 337 F. Supp. 2d at

1031-33.

In order to meet the goals of the Project, the Forest Service proposed in the EA several

alternative courses of action and analyzed each one in conjunction with the Plan as a whole to

determine the cumulative environmental effects, such as, inter alia, forest fragmentation and

biodiversity, caused by each alternative.  (AR Bk. I at 214-248.)  The Forest Service sent the EA

to interested parties and solicited public comment.  (Id. at 257.)  On November 3, 1994, the

District Ranger for Wayne National Forest issued a  FONSI and Decision Notice to adopt

Alternative Two, which included thinning, prescribed burning, and select tree cutting.  (AR Bk.

II at 303.)  The two timber sales constituting the Bluegrass Project were awarded in 1995.

Buckeye, 337 F. Supp. 2d at 1033.

Plaintiff Buckeye challenged the Bluegrass Project in 1996 and the Forest Service

entered into an agreement with Buckeye that resulted in the Forest Service re-marking the

cutting areas of the sales.  (AR Bk. II at 461).  The two sales were enjoined during 1997 and

1998 during a lawsuit challenging the Forest Plan.[2]  After the injunction was lifted, timber

cutting remained suspended while the Forest Service investigated the discovery of the Indiana

bat in the forest.  At the time that the Bluegrass EA was conducted in 1994, the federally

endangered Indiana bat was not known to inhabit the Wayne National Forest, but from 1997-

2000, the Forest Service discovered a number of Indiana bats on the Wayne National Forest a

few miles from the Bluegrass Project site.  Buckeye, 337 F. Supp. 2d at 1033.

The ESA requires each federal agency to "insure that any action authorized, funded, or

carried out by such agency . . . is not likely to jeopardize the continued existence of an

endangered or threatened species or result in the destruction or adverse modification of [the

critical] habitat of such species . . . " 16 U.S.C. § 1536(a)(2).  If an agency determines that an

action that it proposes to take may adversely affect a listed species, it must engage in formal

consultation with Fish & Wildlife.  Id.; 50 C.F.R. § 402.14.  After formal consultation, Fish &

Wildlife must provide the agency with a Biological Opinion ("BiOp") explaining how the

_____

[2]See Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726 (1998).

proposed action will affect the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A). If Fish & Wildlife concludes that the proposed action will jeopardize the continued existence of an endangered species or result in the destruction or adverse modification of its critical habitat, the BiOp must outline any "reasonable and prudent alternatives" that Fish & Wildlife believes will prevent that consequence. 16 U.S.C. § 1536(b)(3)(A). If Fish & Wildlife concludes that the agency action will not result in jeopardy to the endangered species or if Fish & Wildlife offers reasonable and prudent alternatives to avoid that consequence, Fish & Wildlife must provide the agency with an Incidental Take Statement specifying "the impact of such incidental taking on the species," and "reasonable and prudent measures that [Fish & Wildlife] considers necessary or appropriate to minimize such impact," and setting forth "the terms and conditions . . . that must be complied with by the Federal agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4).

In March of 2001, the Forest Service conducted a Biological Assessment to analyze the effect of the continued implementation of the Forest Plan on the Indiana bat and other endangered species. The Forest Service concluded that the Forest Plan might adversely affect the Indiana bat, and therefore entered into formal consulting with Fish & Wildlife. After formal consultation, Fish & Wildlife issued a BiOp on September 20, 2001 concluding that the continued implementation of the Forest Plan was not likely to jeopardize the continued existence of the Indiana bat. (AR Bk. IV at 65-66.) Fish & Wildlife recognized that an allowable amount of harm, or "incidental take," would befall the Indiana bat in the form of habitat loss (id. at 67) and set forth nine Terms and Conditions that the Forest Service was required to follow in order to minimize such incidental take (id. at 69-72). Finally, the BiOp set forth a tiered consultation

system by which the Forest Service was required to submit site-specific project proposals to Fish & Wildlife to determine whether proposed projects might adversely affect endangered species, and, if Fish & Wildlife found an adverse effect, it would issue a "Tier II" BiOp with a project specific incidental take statement (id. at 43) and proposed mitigation measures to allay that effect. Buckeye, 337 F. Supp. 2d at 1034.

Following the issuance of Fish & Wildlife's September 2001 programmatic BiOp, the Forest Service issued a new biological evaluation in February 2002, analyzing the impact of the Bluegrass Project on the Indiana bat in light of Fish & Wildlife's Terms and Conditions. The biological evaluation concluded that, as revised by the Terms and Conditions set forth in Fish & Wildlife's programmatic BiOp, the Bluegrass Project would not jeopardize the continued existence of the Indiana bat. (AR Bk. II at 449.) In July and September of 2002 the Forest Service issued supplemental EA documents and invited public comment, as required by NEPA. In December of 2002, the District Ranger signed a FONSI concluding that the effects of the Bluegrass Project would not significantly impact the human environment. (AR Bk. II at 509.) On November 25, 2003, after considering the impact of the Bluegrass Project in accordance with the tiered system outlined in its programmatic BiOp, Fish & Wildlife issued a Tier II BiOp, concluding that the Bluegrass Project would not jeopardize the continued existence of the Indiana bat and setting forth a separate incidental take statement for the Project. (Id. at 561.) Buckeye, 337 F. Supp. 2d at 1034.

In the meantime, the Wayne National Forest also amended the Forest Plan to incorporate the Terms and Conditions set forth in Fish & Wildlife's programmatic BiOp. The Forest Service undertook a biological evaluation of the Forest Plan in November of 2002 and compared three

7

alternative courses of action, including incorporation of the Terms and Conditions into the Forest Plan.  The Forest Service concluded that the amendment of the Forest Plan to incorporate the Terms and Conditions of the programmatic BiOp would not adversely affect the Indiana bat. (AR Bk. IV at 199-200.)  Fish & Wildlife issued a concurrence letter.  (Id. at 238.)  On May 1, 2003 the Forest Service issued an EA analyzing the environmental impacts of such an amendment (Bk. IV at 330) and issued a FONSI adopting the Forest Plan Amendment for Threatened and Endangered Species.  (Bk. IV at 244.)  Buckeye, 337 F. Supp. 2d at 1034.

Meanwhile, a severe ice storm in February of 2003 damaged and uprooted a substantial number of trees in the Ironton District of the Wayne National Forest.  The Forest Service proposed the Ironton Heavy Fuelwood Project to clear away the debris and prevent an increased risk of forest fire in the Ironton District and on private property near the District.  (AR Bk. III at 29.)  On August 4, 2003, the Forest Service invited public comment on the proposed project (id. at 66) and conducted a biological evaluation regarding the effects of the proposed project on endangered species (id. at 147).  The biological evaluation concluded that the Terms and Conditions of the programmatic BiOp could not be satisfied due to the effects of the ice storm itself.  (Id. at 153.)  The Forest Service therefore requested reinitiation of formal consulting with Fish & Wildlife on the Ironton Project.  Buckeye, 337 F. Supp. 2d at 1034-35.

On December 31, 2003, Fish & Wildlife issued a Tier II BiOp finding that, under the ESA, the Ironton Project would not jeopardize the existence of the Indiana bat.  (Id. at 168.)  The Forest Service issued a Decision Memo implementing the Ironton Project, concluding that the project fell within one of the Categorical Exclusions from the NEPA and thus no EA or EIS was required.  Buckeye, 337 F. Supp. 2d at 1035.

8

Plaintiffs Buckeye and Heartwood filed suit on April 13, 2004 alleging violations of ESA, NFMA, NEPA, and the APA.  On August 4, 2004, this Court granted Plaintiffs' motion for an order temporarily restraining the United States Forest Service from permitting any logging or ground disturbing activity under the authority of the Bluegrass Ridge Decision Notice and FONSI and the Ironton Heavy Fuelwood Decision Memo.  On August 18, 2004, the Court held a hearing on Plaintiffs' motion for preliminary injunction.  This Court granted Plaintiffs' motion for preliminary injunction on August 24, 2004, stating "[a]lthough Plaintiffs may not ultimately prevail on the merits, if an injunction does not issue and the trees are cut down, Plaintiffs will not have an opportunity to even argue the case on the merits because the alleged harm will have already occurred.  The balance of equities therefore weighs heavily in favor of preserving the status quo."  Buckeye, 337 F. Supp. 2d at 1039.  Both sides have submitted cross-motions for summary judgment, on which the Court heard oral argument on July 12, 2005.

## II. NOTICE OF CORRECTION AND MOTION TO STRIKE

As discussed at note 1, supra, Defendants filed a Notice of Correction (doc. #37) to bring to the Court's attention the repeal of the 1982 National Forest Management Act regulations and enactment of new regulations on January 5, 2005.  (Doc. #37 at 2.)  The Forest Service also notes that because the 1988 Forest Plan contained a viability requirement nearly identical to that of the 1982 regulations, by which Defendants must abide, there is no practical effect to the repeal of the 1982 regulations and the promulgation of the 2005 regulations in this case.  See Forest Plan 4-2.  As such, Plaintiffs' opposition to Defendants' Notice of Correction (doc. #38) is **DENIED AS MOOT**.

Plaintiffs also move to strike the photographs Defendants submitted in their Notice of

Lodging of Additional Materials for the Administrative Record after the submission of their motion for summary judgment. Since the Court did not consider these additional photographs in deciding the motions for summary judgment, Plaintiffs' Motion to Strike (doc. #31) is **DENIED AS MOOT**.

### III.    STANDARD OF REVIEW

Because there exists no private right of action under the NFMA, NEPA, or ESA in this case, Plaintiffs bring all of their claims under the Administrative Procedure Act. The standard of review under the APA is limited to determining whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Marsh v. Natural Resources Council, 490 U.S. 360, 376 (1989). The focal point for review is the administrative record already in existence rather than a new record made before the reviewing court. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). The party challenging an agency's actions under the APA bears the burden of showing that the agency's actions were arbitrary and capricious or otherwise not in accordance with law. Sierra Club v. Martita, 46 F.3d 606, 619 (7th Cir. 1995).

### IV.    ANALYSIS

Plaintiffs Buckeye and Heartwood ask the Court to enjoin the projects and Forest Plan amendment challenged in this lawsuit based on alleged violations of the APA, ESA, NEPA, and NFMA. Plaintiffs' fundamental argument is that the project and Forest Plan amendment decisions made by the Wayne National Forest "rest on an inherent contradiction: the United States Fish and Wildlife Service and the Forest Service agreed that implementation of the Wayne National Forest Land and Resource Management Plan is 'likely to adversely affect' the Indiana

10

bat; the Forest Service finds no 'significant' impact on the Indiana bat . . . How a federal action

can adversely affect an endangered species, but the effect not be significant is an 'arbitrary and

capricious' decision without a rational explanation." (Doc. #29 at 1.) Such a conclusion reveals

Plaintiffs' confusion of different standards embodied in the different statutes in question in this

case.

      **A.**     **Endangered Species Act**

Buckeye and Heartwood bring four ESA claims against Defendants, essentially claiming

that Defendants violated the ESA by failing to undertake formal consultation culminating in a

BiOp for the site-specific Bluegrass and Ironton Projects.

Plaintiffs argue that after a February 2002 biological evaluation found that the Indiana

bat might be adversely affected by the Bluegrass Project, the Forest Service was required to

initiate formal consultation with Fish & Wildlife, culminating in a BiOp, and that Defendants did

not do so. Defendants contend that they did, in fact, engage in formal consulting resulting in a

BiOp for both the Bluegrass and Ironton Projects because they complied with the tiered

consultation system set forth in Fish & Wildlife's September 2001 programmatic level BiOp,

which required that site-specific proposals with a possible adverse effect on endangered species

had to be submitted to Fish & Wildlife for a Tier II BiOp with its own Incidental Take

Statement. At the August 18, 2004 hearing, Plaintiffs conceded that they did not necessarily

contend that the tiered consultation system failed to meet the requirements for formal

consultation, but, regardless, they believed that a FONSI under the NEPA is incompatible with a

"no jeopardy" finding under the ESA. On summary judgment, Plaintiffs now argue that the

tiered consultation system fails to meet ESA requirements.

Defendants admit that tiered consultation is not explicitly described in the ESA or its implementing regulations but contend that tiered consultation is a more efficient way for agencies to meet their consultation obligations. Defendants cite to an unpublished District of Washington case, Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries, No. 97-CV-775, 1998 WL 1988556 (W. D. Wash. May 29, 1998), and a Ninth Circuit case, Gifford Pinchot Task Force v. United States Fish & Wildlife Service, 378 F.3d 1059 (9th Cir. 2004) for the proposition that a tiered consultation system fulfills their ESA obligations.

More importantly, Defendants emphasize that the ESA delegates to Fish & Wildlife the authority to consult with agencies and issue opinions on the effects of agency actions. See 16 U.S.C. §§ 1536(a)(2) and (b); 50 C.F.R. § 402.14. When a court reviews an agency's construction of the statute that it administers, the court must consider whether Congress has directly spoken to the particular question at issue. Chevron USA, Inc. v. Natural Resource Defense Council, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If Congress has not directly spoken to the particular question at issue, if the statute is silent or ambiguous concerning that question, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id.

Even when Congress does not engage in express delegation of specific interpretive authority to make rules carrying the force of law, "it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or

fills a space in the enacted law." United States v. Mead Corp., 533 U.S. 218, 229 (2001). In the case of this implicit delegation of authority the reviewing court "is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." Mead. 533 U.S. at 229. Even where agency actions do not merit Chevron deference, they still merit deference given the "specialized experience" of the agency. Id. at 234 (quoting Skidmore v. Swift Co., 323 U.S. 134 (1944)).

Here the agency action at issue – tiering of a site specific biological opinion to a programmatic biological opinion – is not a matter of a regulation promulgated to interpret a statute entitled to Chevron deference. The tiering system is an interpretation of how to go about following the directive of the implementing regulation. The statute in question, 16 U.S.C. § 1536(b)(3)(A) and (4), requires Fish & Wildlife to issue only a "written statement." The written statement is issued if, after consultation regarding the possibility of jeopardy to an endangered species, Fish & Wildlife concludes that the proposed action will not jeopardize an endangered species or if Fish & Wildlife offers reasonable and prudent alternatives to that effect. The written statement specifies the impact of the incidental take of the species, the reasonable and prudent measures to be taken to minimize the impact, and the terms and conditions that must be complied with by the agency. 16 U.S.C. § 1536(b)(4). Implementing regulations require a "biological opinion," which includes a summary of the information on which the opinion is based, a detailed discussion of the effects of the proposed action on the endangered species in question, and Fish & Wildlife's opinion on whether the action is likely to jeopardize the continued existence of an endangered species. 50 C.F.R. § 402.14(h).

Defendants argue that their interpretation of these regulations and their precise

implementation is a matter best left to them and owed deference under <u>Skidmore</u>. This Court agrees with Defendants. The Tier II BiOp (AR Bk. II at 558) at issue in this case specifically refers back to the expansive, programmatic BiOp of September of 2001 (AR Bk. IV at 65-66). The Tier II BiOp reviews the information on which the opinion is based (the Tier I programmatic BiOp, the supplemental Environmental Assessment, and the Biological Evaluation for the Bluegrass Project), discusses the effects of the Project on the endangered species in question, and concludes with the opinion that the Bluegrass Project "is not likely to jeopardize the continued existence of the Indiana bat." (AR Bk. II at 561.) The Tier II BiOp also includes a section entitled "Incidental Take Statement" that specifies the impact of such incidental taking on the Indiana bat, and incorporates the reasonable and prudent measures and implementing terms and conditions stipulated in the Tier I BiOp. Defendants' use of the tiered consultation system has not impeded their fulfilling all requirements mandated by the ESA and its implementing regulations, and, if anything, has increased Defendants' efficiency in fulfilling those requirements. Plaintiffs' motion for summary judgment on their ESA claims is therefore **DENIED** and Defendants' motion for summary judgment on the ESA claims is **GRANTED**.

### B. National Environmental Policy Act Claims

Buckeye and Heartwood claim that Defendants violated NEPA by failing to prepare an EIS in connection with 1) the continued implementation of the Forest Plan, 2) the Threatened and Endangered Species Amendment to the Forest Plan, and 3) the site-specific projects. Plaintiffs also claim that Defendants violated NEPA by failing to issue a new Decision Notice for the Bluegrass Project and by designating the Ironton Project as a Categorical Exclusion not requiring an EA or EIS.

14

### 1.      Failing to Issue an EIS for the Forest Plan

Plaintiffs argue that after the Forest Service discovered the presence of the Indiana bat in the Wayne National Forest, the Forest Service was required to prepare a supplemental EIS regarding the continued implementation of the Forest Plan.  Under NEPA, if an agency proposes a "major Federal action [that] significantly affect[s] the quality of the human environment," the agency must prepare an EIS that details that environmental impact of the proposed agency action.  42 U.S.C. § 4332(C).

Plaintiffs' argument that the Forest Service was required to prepare a supplemental EIS in order to continue implementation of the Forest Plan once the Indiana bat was found in the forest is foreclosed by the Supreme Court's decision in Norton v. Southern Utah Wilderness Alliance, ("SUWA") 542 U.S. 55, 124 S.Ct. 2373 (2004).  Although SUWA involved a land use plan under the Federal Land Policy and Management Act rather than a Forest Plan under the NFMA, the NEPA requirements and APA standard of review are the same.

As the Court pointed out, the only agency action that can be compelled under the APA is agency action that is legally required.  SUWA, 124 S.Ct. at 2379.  A claim that an agency violated the APA by failing to act may proceed only where a plaintiff claims that the agency failed to take a discrete action that it was required to take.  Id. at 2379.  Supplementation of an EIS, the action that Plaintiffs claim that Defendants failed to perform, is necessary only if there remains major federal action to occur as the term is used in 42 U.S.C. § 4332(C).  The Court in SUWA held that "although the approval of a land use plan is a major Federal action requiring an EIS, . . . the action is completed when the plan is approved.  The land use plan is the proposed action contemplated . . .  There is no ongoing major Federal action that could require

15

supplementation (though [the agency] *is* required to perform additional NEPA analyses if a plan is amended or revised . . . .)" SUWA, 124 S.Ct. at 2385 (internal quotations omitted). Because the Forest Plan was approved in 1988, the agency action was completed and there was no ongoing major federal action requiring supplementation. The Forest Service therefore committed no NEPA violation by failing to supplement the EIS for the Forest Plan after the Indiana bat was found on the forest.

### 2. Failing to Issue an EIS for the Threatened and Endangered Species Amendment to the Forest Plan

Plaintiffs contend that the Forest Service was required under NEPA to issue an EIS for the Threatened and Endangered Species Amendment to the Forest Plan. As discussed above, under NEPA, if an agency proposes a "major Federal action [that] significantly affect[s] the quality of the human environment," the agency must prepare an EIS that details that environmental impact of the proposed agency action. 42 U.S.C. § 4332(C). An agency does not have to prepare an EIS if it first prepares an EA that evinces sufficient evidence and analysis that no EIS is necessary because the proposed agency action will not significantly affect the quality of the human environment. See 40 C.F.R. § 1508.9. In such a case, the agency issues a FONSI instead of preparing the EIS. 40 C.F.R. § 1508.13.

In determining whether the acting agency properly decided not to conduct an EIS, the Court may not "substitute its judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." Kelley v. Selin, 42 F.3d 1501, 1518-1519 (6th Cir. 1995). Hence, the Court is limited to examining whether the Forest Service took a "hard look" at the environmental consequences of amending the Forest Plan prior to issuing the FONSI. Id.; Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373-74

(1989).

Plaintiffs argue that because Defendants violated the ESA in the consultation process and found that continued implementation of the unamended Forest Plan was likely to adversely affect the Indiana bat, an amendment to the Forest Plan incorporating the Terms and Conditions of the programmatic BiOp qualifies as a potentially significant impact requiring an EIS. (Doc. #29 at 25.) First, the Court has found supra that Defendants did not violate the ESA. Second, the Forest Service conducted an EA analyzing the potential impacts of three different alternatives, the first being the incorporation of the required Terms and Conditions and reasonable and prudent measures of the programmatic BiOp; the second being no action; and the third including the incorporation of the Terms and Conditions and reasonable and prudent measures in addition to further protection in the form of incorporation of the discretionary measures proposed by the BiOp and new information about the Indiana bat's preferred tree species. The EA found that the first and third alternatives minimized the impacts of the incidental take of the Indiana bat. (AR Bk. IV at 372.) The Forest Service decided to adopt the third alternative, which was the most protective of the bat. This decision was subject to public notice and comment. (Id. at 241.)

"If the agency reasonably concludes, on the basis of the environmental assessment, that the project will have no significant adverse environmental consequences, an environmental impact statement is not required." Friends of Fiery Gizzard v. Farmers Home Administration, 61 F.3d 501, 505-06 (6th Cir. 1995). Since the Threatened and Endangered Species Amendment requires the Forest Service to take more protective measures concerning the Indiana bat and its habitat while implementing site specific projects than the Forest Service was previously required to do under the Forest Plan in place, the amendment is beneficial to the Indiana bat. The Forest

17

Service's conclusion, on the basis of the EA, that the Threatened and Endangered Species Amendment to the Forest Plan would have no significant adverse environmental consequences is entirely reasonable; an EIS was therefore not required.

Plaintiffs also argue that the Forest Service's decision to prepare a biological assessment in March of 2001 in connection with studying the effects of the continuing implementation of the Forest Plan somehow constitutes an admission that any amendment to the Forest Plan would be a "major construction activity" requiring an EIS. 50 C.F.R. § 402.12 states that the purpose of a biological assessment is to evaluate the potential effects of an action on threatened and endangered species and determine whether such species or their habitat are likely to be adversely affected by the action. 50 C.F.R. § 402.12(a). The regulation also states that such an assessment is required for federal actions that are major construction activities. 50 C.F.R. § 402.12(b). Plaintiffs, however, read the statute in reverse, arguing that since an assessment is required for major construction activities, the undertaking of an assessment must mean that a major construction activity is taking place. The plain language of the statute by no means transforms an agency's choice to study the effects of a proposed action into an admission of some kind that such an action is a major construction activity. Plaintiffs' argument that the Forest Service committed a NEPA violation by failing to prepare an EIS for the Threatened and Endangered Species Amendment to the Forest Plan must fail.

Finally, Plaintiffs also claim that Defendants violated NEPA by failing to consider an adequate range of alternatives to the proposed action, particularly Plaintiffs' own suggestion of a "no logging" course of action. 40 C.F.R. § 1502.14 directs Defendants to "rigorously explore and objectively evaluate all reasonable alternatives . . . ." Since Plaintiffs' no logging suggestion

18

was not consistent with the purpose of amending the Forest Plan to incorporate protections and directions regarding management of threatened and endangered species, it cannot be said to be a reasonable alternative to Defendants' proposed action.  The Forest Service therefore committed no NEPA violation by failing to rigorously explore and evaluate Plaintiffs' no logging suggestion.

### 3.     Failing to Prepare an EIS for the Bluegrass Project

As stated above, an agency does not have to prepare an EIS if it first prepares an EA that evinces sufficient evidence and analysis that no EIS is necessary because the proposed agency action will not significantly affect the quality of the human environment.  See 40 C.F.R. § 1508.9.

Plaintiffs argue that an EIS was required for the Bluegrass Project because it is associated with various indicators of "significance" set out in the federal regulations:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas . . .

19

> . . . (7) Whether the action is related to other actions with individually
> insignificant but cumulatively significant impacts. Significance exists if it
> is reasonable to anticipate a cumulatively significant impact on the
> environment. Significance cannot be avoided by terming an action
> temporary or by breaking it down into small component parts . . .
> (9) The degree to which the action may adversely affect an endangered or
> threatened species or its habitat that has been determined to be critical
> under the Endangered Species Act of 1973.

40 CFR § 1508.27.

Plaintiffs refer to indicators (7) and (9): cumulative impact and degree to which the

Project will adversely affect an endangered species.  Plaintiffs argue that there exists a

fundamental contradiction in Fish & Wildlife's finding that the Bluegrass Project may adversely

affect the Indiana Bat and its finding of "no significant impact" under NEPA.  As Defendants

emphasized at oral argument, context and intensity are the two major considerations in

evaluating an action's significance.  The Bluegrass Project involves a small amount of acreage,

without any known Indiana bat hibernacula, in a large forest.  After discovering the Indiana bat

on the Wayne National Forest, the Forest Service undertook a supplemental EA that analyzed the

Bluegrass Project in terms of both cumulative impact and effect on the Indiana bat.  The EA

discussed the Terms and Conditions imposed by the programmatic BiOp in order to avoid

adversely impacting the Indiana bat.  (AR Bk. II at 470).  The supplemental EA found that

applying the Terms and Conditions of the BiOp, which the Forest Service must apply to avoid

adversely impacting the bat and other species, would be a relatively simple process, involving

deducting trees from the project that would provide potential bat roosts.  (Id. at 467.)  The Forest

Service also updated the biological evaluation for the Project and considered it in undertaking

the EA, which was subject to public notice and comment.

Taking into consideration the presence of the Indiana bat on the Wayne National Forest,

20

the new BE for the project and the effects of implementing the Terms and Conditions of the programmatic BiOp, the Forest Service found that all of the protective measures ensuring sufficient habitat for the Indiana bat set forth in the programmatic BiOp could easily be met. (AR Bk II at 464-70).  Accordingly, it issued a FONSI.  (AR Bk. II at 509.)  In the FONSI, the Forest Service discussed each factor listed in 40 CFR § 1508.27, including cumulative effects and effects on endangered species, and concluded that the context and intensity of the project did not rise to the level of a significant effect on the human environment.

The administrative record makes clear that the Forest Service seriously considered the significance of the Bluegrass Project in relation to the Indiana bat.  It undertook a new biological assessment of the Forest Plan, a new biological evaluation specifically addressing the Bluegrass Project, a supplemental EA for the Bluegrass Project, and a FONSI.  The FONSI details each of the ten indicators of "significance" and explains why none apply.  Given this extensive analysis, it cannot be said that the Forest Service failed to take a "hard look" at the environmental consequences of the Bluegrass Project.  The Court may not "substitute its judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." Kelley v. Selin, 42 F.3d at 1518-1519.  The Court finds from the administrative record that the Forest Service more than adequately studied the effects of the Bluegrass Project in determining that no EIS was warranted.  The Forest Service committed no NEPA violation by failing to prepare an EIS for the Bluegrass Project.

### 4.   Failing to Consider Cumulative Impact of Bluegrass and Ironton Projects Together

Plaintiffs claim that the Forest Service violated NEPA by failing to consider the cumulative impacts of the Ironton and Bluegrass Projects on the Indiana bat.  Plaintiffs claim

that other thinning/burning activities have been proposed, and the Forest Service has failed to evaluate the cumulative effect of the Ironton and Bluegrass Projects along with these proposed projects.  To support this proposition, Plaintiffs refer to an e-mail that refers to a "burn study" (AR Bk. II at 373).  Plaintiffs have shown nothing to indicate the size, significance, or activity involved in this "burn study."

Regarding the analysis of the cumulative effects of the Bluegrass and Ironton Projects together, the Bluegrass EA and FONSI did not consider the Ironton Project because the ice storm occurred after they were issued.  The Forest Service did not produce an EA for the Ironton Project because the Forest Service determined that it fell within a Categorical Exclusion of NEPA, negating the EA and EIS requirements.  The Forest Service did examine the cumulative impact of the two projects, however, in the biological evaluation it conducted concerning the Ironton project in December of 2003.  (AR Bk. III at 157.)  Fish & Wildlife's Tier II BiOp also evaluated the incidental take of the Indiana bat in the Ironton Project in conjunction with other activities and concluded that it was acceptable.  (AR Bk. III at 168.)  Plaintiffs have failed to prove that the Forest Service failed to take a "hard look" at the cumulative impact of the projects.

### 5. Failing to Issue a New Decision Notice for the Bluegrass Project

Plaintiffs also claim that Defendants' failure to issue a new Decision Notice for the Bluegrass Project violates NEPA.  The failure to issue a new Decision Notice does not itself violate NEPA or its implementing regulations.  Plaintiffs argue that since the supplemental EA on the Bluegrass Project was issued nine years after the first EA and after discovery of the Indiana bat, relying on the original Decision Notice is arbitrary and capricious.  Section 1909.15 of the Forest Service Handbook instructs that if there exists new information or changed

22

circumstances concerning a project, the Forest Service should revise the EA and prepare a

FONSI (if appropriate), and, based upon the EA and FONSI, issue a new decision notice or

document that the original decision is to remain in effect and unchanged.  (AR Bk. IX at 2134.)

The Forest Service revised the EA and prepared a new FONSI – since the original decision to

proceed with the project had not changed, the Forest Service was not required to prepare a new

Decision Notice, but only to document that the original decision was to remain unchanged.  The

Forest Service did so.  (AR Bk. II at 512.)  Plaintiffs have failed to prove a NEPA violation in

connection with Defendants' failure to issue a new Decision Notice for the Bluegrass Project.

### 6.     Categorical Exclusion for the Ironton Project

Plaintiffs claim that the Forest Service's designation of the Ironton project as a

Categorical Exclusion that does not require an EA or EIS violates NEPA.  The Forest Service

found that the Ironton Project fell within the category of a fuel reduction activity using

prescribed fire not to exceed 4,500 acres and would not cause any "direct, indirect or cumulative

adverse effects which could jeopardize the continued existence of any Federal or Threatened or

Endangered Animal Species . . .  which may occur on the Wayne National Forest" (AR Bk. III at

8-9).  The Forest Service made this finding after conducting a site specific BiOp, and biological

evaluation.  Plaintiffs have failed to show that the Forest Service acted in an arbitrary and

capricious manner or contrary to law in designating the Ironton Project as a Categorical

Exclusion.

Plaintiffs' motion for summary judgment on their NEPA claims is therefore **DENIED**

and Defendants' motion for summary judgment on the NEPA claims is **GRANTED**.

### C.     National Forest Management Act Claim

23

Plaintiffs claim that Defendants violated NFMA by failing to follow the requirement that the fish and wildlife habitat be managed to maintain viable populations of existing vertebrate species in the planning area.  The 1982 planning regulations explain that "[i]n order to insure that viable species will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area."  36 C.F.R. § 219.19 (1982).  The administrative record makes clear that Defendants have instituted a number of procedures – including all of the Terms and Conditions and reasonable and prudent measures of the programmatic BiOp – in order to protect and maintain the population and the habitat of the Indiana bat.  Plaintiffs have put forward no evidence or argument to show that Defendants have failed to work to maintain the viability of the Indiana bat.  Plaintiffs' motion for summary judgment on their NFMA claim is therefore **DENIED**, and Defendants' motion for summary judgment on the NFMA claim is **GRANTED**.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (doc. #29) is **DENIED**, and Defendants' cross motion for summary judgment (doc. #32) is **GRANTED**. Plaintiffs' opposition to Defendants' Notice of Correction (doc. #38) and Motion to Strike (doc. #31) are **DENIED AS MOOT**.

IT IS SO ORDERED.


        s/Susan J. Dlott
Susan J. Dlott
United States District Judge

24